UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MELVIN C. WASHINGTON   :   NO.: 3:20-cv-01499-AVC
              :
              :
v.             :
              :
BLAIN J. ROGOZINSKI and   :
JONATHAN DAVIS     :   JULY 8, 2021

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed.R.Civ.P. 56 and Local Rule 56, *et seq.*, Defendants hereby submit their Memorandum of Law in support of their Motion for Summary Judgment as to the Complaint filed by the Plaintiff as follows:

I.  **INTRODUCTION**

  a. **Procedural Background**

On September 10, 2020, Plaintiff filed this action in the Connecticut Superior Court, Judicial District of New Britain. (Doc. #1.)  On October 2, 2020, Defendants removed this case to Federal District Court because Plaintiff's action raises a number of federal Constitutional claims against Defendants pursuant to 42 U.S.C. Sec. 1983. (Id.) Plaintiff's most recent Revised Complaint dated December 7, 2020 now includes eight (8) claims under Sec. 1983 against Defendants, which include:  False Arrest, Malicious Prosecution, Unreasonable Search and Seizure, violation of Plaintiff's Equal Protection rights, Excessive Use of Force, violation of Plaintiff's Due Process rights, violation of Plaintiff's Religious Free Exercise rights and a claim against Defendants in their "official

capacity" based on perceived unconstitutional acts by Defendants' municipal employer.[1] (the "Revised Complaint," Doc. #33.)[2]  Plaintiff's Revised Complaint also alleges a number of state claims against Defendants, which include:  Assault, Intentional Infliction of Emotional Distress, Negligence, and "Conspiracy to Obstruct State Court Justice." (Id.)

On December 23, 2020, Defendants filed their Answer to Plaintiff's Revised Complaint. (Doc. #36.)  In their Answer, Defendants deny liability as to each of Plaintiff's claims and plead the following Affirmative/ Special Defenses: 1) The Complaint fails to state a claim upon which relief may be granted; 2) The Plaintiff's claims, in whole or in part, are barred by the doctrine of qualified immunity; 3) At all relevant times, the individual Defendants, Blain J. Rogozinski and Jonathan Davis, each acted in good faith in the discharge of their duties as a police officer for the City of New Britain and with reasonable belief in the lawfulness of his acts; and 4) The Plaintiff's claims, in whole or in part, are barred by the doctrine of governmental immunity pursuant to C.G.S. Sec. 52-557n, to which no exception applies. (Id.)

---

[1] Plaintiff in his Revised Complaint alleges that Defendants are "[policemen] in the City of New Britain" that are "sued in [their] individual and official capacity." (Id at ¶¶3-4.)  However, Plaintiff's official capacity claim against Defendants is unsustainable.  "[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983); See Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). Plaintiff's Revised Complaint alleges no facts that demonstrate the existence of a policy or custom of the City of New Britain that caused Plaintiff to be subject to unconstitutional conduct.  Therefore, Plaintiff's "official capacity" claim must be dismissed.

[2] Plaintiff filed a new revised complaint dated May 21, 2021 at Doc. #54 which is nearly identical in substance to the Revised Complaint at Doc. #33.  However, the new revised complaint at Doc. #54 is not an operative pleading as Plaintiff filed this new revised complaint well after the December 11, 2020 deadline established in the parties' Rule 26f Report to file amended pleadings. See Parties' Rule 26f Report at Doc. #26. ("All amended pleadings will be filed by December 11, 2020.")

### b.  The Complaint

Plaintiff's Revised Complaint alleges the following facts:  On April 19, 2019, at approximately 5:30 a.m., Plaintiff embarked on his daily morning walk. (Doc. #33, *supra*, ¶¶5-6.)  Plaintiff states that it is his habit to carry a tree branch with him on his daily morning walks to assist him in detecting the ground because he has diminished vision in one eye. (Id at ¶5.)  However, Plaintiff states that on that particular morning Plaintiff instead utilized a "smaller plastic stick" in place of his usual tree branch. (Id at ¶6.)

According to Plaintiff, his walk took him near the front entrance of The Hospital of Central Connecticut (hereinafter the "Hospital") where he encountered an individual named Wilfredo Rodriguez (hereinafter "Rodriguez") and another unidentified male. (Id at ¶7.)  Plaintiff states that he then began to speak to these two men. (Id.)  According to Plaintiff, Rodriguez then abruptly "snatched Plaintiff's stick." (Id at ¶8.)  Plaintiff states that he immediately asked Rodriguez to return the stick. (Id.)  Rodriguez did not return the stick to Plaintiff but instead "solicited a security guard from the hospital building" and also stated to Plaintiff that he had called the police. (Id at ¶9.)  Shortly thereafter, "a security guard" named Connor Hourigan (hereinafter "Hourigan") emerged from the front of the Hospital and "stood threateningly" in front of Plaintiff. (Id.)  According to Plaintiff, Hourigan "demanded that the plaintiff stick out his arms; at which time [Hourigan] grabbed the plaintiff's arm [while] twisting it." (Id at ¶11.)  The unidentified male also "rushed at the plaintiff; grabbing at plaintiff from the frontal area." (Id.)  Rodriguez also "rushed at the plaintiff from the rear grabbing the Plaintiff's legs." (Id.)  Plaintiff states that his physical encounter with these three men caused him to sustain "scraping injuries." (Id. at ¶34.)  Throughout this encounter, Plaintiff "repeated several

times" that he "had an emergency room device attached." (<u>Id</u> at ¶¶10,12.)  Thereafter, New Britain Police Officers Rogozinski and Davis arrived at the Hospital. (<u>Id</u> at ¶¶3-4,13.)  By the time Rogozinski and Davis arrived at the Hospital "plaintiff was on the pavement with hands cuffed in back and assailants sitting on him." (<u>Id</u> at ¶13.)  Plaintiff states that "the assailants" moved themselves off of Plaintiff at the direction of Davis and Davis removed the handcuffs from Plaintiff. (<u>Id</u> at ¶14.)  Although Defendants were not present at the Hospital at the time Plaintiff was attacked by these men, Plaintiff alleges that the acts of these men are also attributable to Defendants because, according to Plaintiff, Defendants possessed the same "racial animus" as these men. (<u>Id</u> at ¶40.)

Plaintiff states that Davis then put his own handcuffs on Plaintiff and also took possession of Plaintiff's wallet from "the assailants" who had taken the wallet from Plaintiff. (<u>Id</u> at ¶14.)  According to Plaintiff, Davis should not have taken this action because Plaintiff had explained to Defendants that he "was the victim of assault." (<u>Id</u> at ¶¶15-17.)  Plaintiff also states that his jacket was "ripped into several pieces" (<u>Id</u> at ¶18.) Thereafter, Plaintiff was transported in a police vehicle to the police station. (<u>Id</u> at ¶¶15-16.)  Plaintiff asserts that these acts constitute an "illegal arrest" without probable cause, violation of Plaintiff's right to equal protection due to "racial complicity and animus," violation of Plaintiff's due process rights, and "conspiracy to obstruct state court justice." (<u>Id</u> at ¶¶1,29-34,38.)

Further, Plaintiff explained to both Rogozinski and Davis that he was wearing an "emergency room catheter," however Rogozinski and Davis did not acknowledge these statements. (<u>Id</u> at ¶¶15-17.)  Davis also did not recognize that Plaintiff was wearing a

catheter despite Davis's "thorough" search of Plaintiff, including his crotch area, although Plaintiff does believe that Davis's search was a "fake" search. (Id at ¶21.) [3] Plaintiff demonstrated to Rogozinski and Davis that he was wearing a catheter by lifting his trousers and showing Rogozinski and Davis the catheter. (Id at ¶23.)  Plaintiff asserts that these acts constitute negligence and the intentional infliction of emotional distress. (Id at ¶¶36,44.)

Plaintiff also states that he was photographed at the police station, which violated his "religious principles" because he was "without his cap." (Id at ¶¶20,42.)  However, Plaintiff "did not feel free to protest being photographed" due to "intimidation and racial animus shown by the defendants." (Id.)

Plaintiff also alleges that Rogozinski and Davis "fabricated" their account of Plaintiff's arrest in their police reports. (Id at ¶¶24-25.)  Plaintiff states that Rogozinski and Davis's police reports state falsely that "there were several safety officers involved; whereas there was no safety officer at all," although Plaintiff admits that Hourigan is a "security guard." (Id at ¶24.)  Plaintiff also states that one police report falsely states that "an outside video camera at the hospital captured the entire incident." (Id at ¶25.) Additionally, Plaintiff believes that the police reports also fail to document a number of critical facts.  According to Plaintiff, the police reports do not state that Davis "returned plaintiff's jacket which had been ripped into several pieces," that "plaintiff had an attached medical device," that the "assailants were piled on top of the plaintiff," that "the assailants had taken plaintiff's wallet," that "plaintiff was attacked without provocation,"

---

[3] The allegation that Plaintiff was physically searched (in addition to the previously mentioned claims that Plaintiff's wallet was confiscated and that Plaintiff's jacket was damaged) is presumably pled in connection with Plaintiff's unreasonable search and seizure claim. (Id at ¶¶1,14,18.)

and that Plaintiff "had scrapes and bruises." (<u>Id</u> at ¶¶18,34.)  Plaintiff alleges that these acts deprived him of procedural due process. (<u>Id</u> at ¶34.)

Finally, Plaintiff alleges that he was subject to malicious prosecution in that Plaintiff was ultimately "prosecuted in state court" in connection with his April 19, 2019 arrest and that "the case was dismissed by the court in favor of plaintiff." (<u>Id</u> at ¶45.)

## II.   <u>MATERIAL FACTUAL BACKGROUND</u>

Defendants have filed in support of their Memorandum of Law a Local Rule 56(a)(1) Statement of Material Facts.[4]  Defendants restate and incorporate by reference their entire Local Rule 56(a)(1) Statement as if fully set forth herein.

## III.   <u>LAW AND ARGUMENT</u>

### a.  Legal Standard for Summary Judgment

<u>Rule 56(a)</u> of the Federal Rules of Civil Procedure, provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Fed. R. Civ. P 56(a)</u>.  A fact is "material" if it "might affect the outcome of the suit under the governing law" and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). This burden can be met either by offering evidence to disprove an element of the plaintiff's case or by demonstrating an absence of evidence to support the non-moving party's case. <u>Id</u> at 325.  Once the moving party has satisfied that burden, in order to

---

[4] <em>See</em> Local Rule 56(a)(1) Statement of Material Facts (with supporting documentary evidence) attached to Defendants' Memorandum of Law.

defeat the motion, "the party opposing summary judgment… must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  Fed. R. Civ. P. 56(a) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id at 327 (quoting Rule 1 of the Federal Rules of Civil Procedure).

"[T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original).  A non-moving party may not rely on mere allegations, legal conclusions, unsupported statements or a denial of the pleadings. *See* Celotex, 477 U.S. at 327.

### b.  Claims Pursuant to 42 U.S.C. Sec. 1983 - Generally:

42 U.S.C. Sec. 1983 provides that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State… subjects, or causes to be subjected, any citizen of the United States… to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  Sec. 1983 "…is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States

Constitution and federal statutes that it describes." <u>Baker v. McCollan</u>, 443 U.S. 137, 144 n.3 (1979); <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 225 (2d Cir. 2004).

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation." <u>Grullon v. City of New Haven</u>, 720 F.3d 133, 138 (2d Cir. 2013).   A plaintiff can establish personal involvement by demonstrating that the defendant: "(i) personally participated in the alleged constitutional violation, (ii) was grossly negligent in supervising subordinates who committed the wrongful acts, or (iii) exhibited deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring." <u>Provost v. City of Newburgh</u>, 262 F.3d 146, 154 (2d Cir. 2001) (citing <u>Colon v. Coughlin</u>, 58 F.3d 865, 873 (2d Cir. 1995).

**c.  Qualified Immunity - Generally:**

"The doctrine of qualified immunity protects government officials 'from liability for civil damages [under 42 U.S.C. 1983] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The protection of qualified immunity applies regardless of whether the official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." <u>Id</u> at 231 (quoting <u>Groh v. Ramirez</u>, 540 U.S. 551, 567

(2004.)  The factors to assess in determining whether a right was clearly established are: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." Pena v. DePrisco, 432 F.3d 98, 115 (2d Cir. 2005) (citation omitted.) "…[B]ecause law enforcement work relies on probabilities and reasonable suspicions in an almost infinite variety of circumstances, many requiring prompt action, there can frequently be a range of responses to given situations that competent officers may reasonably think are lawful [and].. [w]ithin this range, an officer enjoys qualified immunity for 'reasonable mistakes.'" Walczyk v. Rio, 496 F.3d, 139, 154 n.16 (2d Cir. 2007).  "Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995).

"For a defendant to secure summary judgment on the ground of qualified immunity, he must show that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Ford v. Moore, 237 F.3d 156, 162 (2d Cir. 2001).  Additionally, "a court may grant [summary] judgment if it is clear—after viewing the facts in the light most favorable to plaintiff—that reasonable law enforcement officers could have disagreed about whether defendants' conduct violated the law." Ozga v. Elliot, 150 F. Supp. 3d 178, 189 (D. Conn. 2015).

### d. Plaintiff's Claims for False Arrest and Malicious Prosecution Fail as a Matter of Law.

#### 1) False Arrest and Malicious Prosecution Claims - Generally:

"[F]alse arrest… is the unlawful restraint by one person of the physical liberty of another." Lo Sacco v. Young, 20 Conn. App. 6, 19 (1989) (citations and internal quotation marks omitted.)  "…[T]o the extent [a claim of false arrest]… serve[s] as a predicate for constitutional claims pursued under § 1983 …a plaintiff [must demonstrate that he or she] was subject by a state actor to an unlawful seizure of his person under the Fourth Amendment." Ozga v. Elliot, *supra*, 150 F. Supp. 3d at 187 (citing Russo v. City of Bridgeport, 479 F.3d 196 (2d Cir. 2007).  In Connecticut, "…a plaintiff must [also] show that the charges underlying the arrest terminated in his favor." Williams v. City of Waterbury, 2018 U.S. Dist. LEXIS 2097 *13 (D. Conn. 2018); *See* Miles v. City of Hartford, 445 Fed. Appx. 379, 383 (2d Cir. 2011) ("[F]avorable termination is an element of 'a section 1983 claim sounding in false imprisonment or false arrest.'")

"The existence of probable cause to arrest… is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013) (citation omitted.) "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Id.

"To state a claim for malicious prosecution under Connecticut law, plaintiff must prove four elements: (1) the defendant initiated or continued criminal proceedings against [him]; (2) the criminal proceeding terminated in favor of [him]; (3) the defendant

acted without probable cause; and (4) the defendant acted with malice." <u>Belton v.</u>
<u>Wydra</u>, 2019 U.S. Dist. LEXIS 83540 *20 (D. Conn. May 17, 2019) (internal quotation
marks omitted) (quoting <u>McHale v. W.B.S. Corp.</u>, 187 Conn. 444, 447 (1982.)  "Like
false arrest... a malicious prosecution claim brought pursuant to section 1983… as a
violation of the Fourth Amendment… is substantially the same as a claim for malicious
prosecution under state law." <u>Id</u> at *19 (internal quotation marks and citation omitted.)
As with a claim for false arrest, "[t]he existence of probable cause is a complete defense
to [a] claim for malicious prosecution." <u>Id</u> at *20 (citation omitted.)  "The probable cause
standard in the malicious prosecution context is slightly higher than the standard for
false arrest cases… Probable cause, in the context of malicious prosecution, has…
been described as [the existence of] such facts and circumstances [that]… would lead a
reasonably prudent person to believe the plaintiff [is] guilty" of a crime. <u>Stansbury v.</u>
<u>Wertman</u>, 721 F.3d 84, 95 (2d Cir. 2013) (citations omitted.)

2)  <u>Rogozinski and Davis had Probable Cause to Arrest and</u>
<u>Commence Criminal Proceedings Against Plaintiff.</u>

There is no doubt that Rogozinski and Davis had probable cause to arrest and
seek prosecution of Plaintiff for the crime of Assault of Public Safety Personnel and
Breach of Peace in the Second Degree.

According to <u>Subsection (a)</u> of <u>C.G.S. Sec. 53a-167c</u> of the Connecticut Penal
Code, "[a] person is guilty of assault of public safety… personnel when, with intent to
prevent a reasonably identifiable security officer… from performing his or her duties,
and while such security officer… is acting in the performance of his or her duties… such
person causes physical injury to such security officer…" <u>Sec. 53a-167c(a)</u>.  For
purposes of <u>Sec. 53a-167c</u>, the phrase "…'security officer' has the same meaning as

provided in section 29-152u." Sec. 53a-167c(a).  According to C.G.S. Sec. 29-152u,

"…'[s]ecurity officer' means the licensed and registered person hired to safeguard and

protect persons and property, by the detection or prevention of any unlawful intrusion or

entry, larceny, vandalism, abuse, arson or trespass on the property such security officer

is hired to protect…" Sec. 29-152u(7)(A).  Assault of Public Safety Personnel is a Class

C felony. Sec. 53a-167c(b).

Further, according to Subsection (a) of C.G.S. Sec. 53a-181, "[a] person is guilty

of breach of the peace in the second degree when, with intent to cause inconvenience,

annoyance or alarm, or recklessly creating a risk thereof, such person… assaults or

strikes another…"  Breach of Peace in the Second Degree is a Class B Misdemeanor.

Sec. 53a-181(b).

On April 19, 2019 Rogozinski and Davis responded to the Hospital in response to

a report of an active physical disturbance involving Hospital safety officers. (Local

56(a)(1) Statement, ¶1.)  Upon arriving at the Hospital, Rogozinski and Davis observed

several uniformed Hospital safety officers standing next to a man sitting on a bench who

was later identified as the Plaintiff. (Id at ¶2.)  At that time, Plaintiff was handcuffed and

detained by the uniformed Hospital safety officers. (Id.)  Despite Plaintiff's allegation to

the contrary, at no time did Rogozinski or Davis observe any person sitting on top of

Plaintiff, lying on top of Plaintiff, or in any way placed on top of Plaintiff; nor did

Rogozinski or Davis observe any scrapes, bruises or other injuries on Plaintiff; nor did

Plaintiff complain of any scrapes, bruises or other injuries. (Id at ¶¶3,44); (Doc. #33,

supra, at ¶¶13,34.)

While at the Hospital Rogozinski conducted a police investigation in order to uncover the circumstances of the reported physical disturbance at the Hospital, and Davis conducted a police investigation in a support role to Rogozinski that was limited in scope to taking written statements from witnesses on scene at the Hospital and tagging evidence. (Id at ¶5.)  During Rogozinski's investigation, Rogozinski interviewed Plaintiff, who told Rogozinski that he had been assaulted by Hospital security. (Id at ¶6.) Rogozinski also interviewed Rodriguez and Hourigan and both men described to Rogozinski their account of their interactions with Plaintiff at the Hospital. (Id.) Rodriguez told Rogozinski that while Rodriguez was standing at his post in front of the Hospital, Plaintiff had walked up to Rodriguez and started heckling him, which prompted Rodriguez to start laughing. (Id at ¶7.)  Rodriguez stated to Rogozinski that Plaintiff then hit him on the chest with a plow stick. (Id at ¶8.)  Rodriguez told Rogozinski that he told Plaintiff to stop hitting him. (Id at ¶9.)  Rodriguez told Rogozinski that Plaintiff then walked away from Rodriguez for a brief moment and then walked back towards Rodriguez, at which time Plaintiff started yelling at Rodriguez and then Plaintiff attempted to hit Rodriguez again with the plow stick. (Id at ¶10.)  Rodriguez stated to Rogozinski that he did not know Plaintiff nor did he know why Plaintiff decided to start hitting him with a plow stick. (Id at ¶11.)

Rodriguez stated to Rogozinski that he then flagged down Hourigan for assistance. (Id at ¶¶12-13.)   According to Rogozinski and Davis, Hourigan was a clearly identifiable uniformed safety officer in that Hourigan was wearing a blue security uniform shirt adorned with a patch on the chest area with the words "Public Safety Officer" in clear lettering across the patch and was also adorned with a patch on the

chest area depicting the flag of the United States of America. (Id at ¶4.)  At that time to

the best of the knowledge and belief of both Rogozinski and Davis, Hourigan was

performing his duties as a licensed and registered or otherwise duly authorized security

officer hired to safeguard and protect persons and property at the Hospital through

detection or prevention of any unlawful intrusion or entry, larceny, vandalism, abuse,

arson or trespass at the Hospital. (Id.)  Hourigan explained to Rogozinski that as

Hourigan approached Rodriguez, Hourigan observed Plaintiff strike Rodriguez with a

four (4) foot orange plow stick. (Id at ¶14.)  Hourigan stated to Rogozinski that he

attempted to separate Plaintiff from Rodriguez. (Id at ¶15.)  Hourigan then stated to

Rogozinski that as Hourigan attempted to separate Plaintiff from Rodriguez, Plaintiff

now began to display assaultive behavior towards Hourigan. (Id at ¶16.)  Hourigan and

Rodriguez stated to Rogozinski that Plaintiff then grabbed Hourigan's uniform shirt in an

apparent attempt to harm Hourigan. (Id at ¶¶17-18.)  Hourigan stated to Rogozinski that

Hourigan physically took Plaintiff to the ground, handcuffed Plaintiff and called for

backup. (Id at ¶¶19-21.)  Hourigan also stated to Rogozinski that as a direct result of his

physical encounter with Plaintiff, Hourigan suffered a quarter inch scratch on his right

wrist, which Rogozinski observed. (Id at ¶22.)

According to Rogozinski it was clear to Rogozinski based upon his police

investigation, and according to Davis it was clear to Davis based upon Rogozinski's

verbal statements to Davis at the Hospital, and based upon Davis's own personal

observations at the Hospital, that Plaintiff had struck Rodriguez with a plow stick and

that Plaintiff had grabbed Hourigan's uniform shirt in a hostile manner and caused

physical injury to Hourigan. (Id at ¶¶23,25.)  It was clear to Rogozinski and Davis that no

acts of Rodriguez or Hourigan in any way justified Plaintiff's hostile acts. (Id at ¶24.)  It was also clear to Rogozinski and Davis that Plaintiff's claim that he was assaulted by Hospital security was a misrepresentation of Hourigan's acts in physically subduing and restraining Plaintiff, which were wholly justified and entirely lawful based on Plaintiff's violent behavior. (Id at ¶26.)  It was also clear to Rogozinski and Davis that any action taken by other individuals at the Hospital to physically restrain or subdue Plaintiff in response to Plaintiff's violent behavior was also entirely reasonable and justified. (Id at ¶27.)  It was also clear to Rogozinski and Davis that Plaintiff was not physically injured by any individual at the Hospital. (Id.)  It was also clear to Rogozinski and Davis that no person at the Hospital committed any criminal act against Plaintiff. (Id.)  Therefore, it was clear to Rogozinski and Davis that Plaintiff's attacks on Rodriguez and Hourigan were wholly unjustified and illegal. (Id at ¶28.)  At the conclusion of the police investigation, Rogozinski placed Plaintiff under arrest for violating <u>C.G.S. Sec. 53a-167c</u> "Assault on a Public Safety Officer" and <u>C.G.S. Sec. 53a-181</u> "Breach of Peace 2nd." (Id at ¶¶29,36.)

Although Davis himself did not personally interview each of the witnesses at the Hospital, Davis was entitled to seek arrest and prosecution of Plaintiff based on Rogozinski's communications to Davis that there was probable cause that Plaintiff committed a crime.  "Under the collective or imputed knowledge doctrine, an arrest or search is permissible where [an]… actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." <u>United States v. Colon</u>, 250 F.3d

130, 135 (2d Cir. 2001.)  "The rule exists because, in light of the complexity of modern police work, [an]… arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates." Id. (internal quotation marks omitted.)  "The collective knowledge doctrine was developed in recognition of the fact that with large police departments and mobile defendants, an arresting officer might not be aware of all the underlying facts that provided probable cause or reasonable suspicion, but may nonetheless act reasonably in relying on information received by other law enforcement officials." Id.  "A primary focus in the imputed knowledge cases is whether the law enforcement officers initiating the search or arrest, on whose instructions or information the actual searching or arresting officers relied, had information that would provide reasonable suspicion or probable cause to search or arrest the suspect." Id. at 135-136.  "…[T]he caselaw is clear that an officer need not have been personally aware of the underlying facts that provided the basis for the probable cause determination in order to have acted reasonably." Belton v. Wydra, 2021 U.S. Dist. LEXIS 50694, *19 (D. Conn. Mar. 18, 2021).

Further, although Plaintiff explained to Defendants that it was the Hospital's security officers who committed criminal acts, and not the Plaintiff, Defendants' belief that there was probable cause to arrest and seek prosecution of Plaintiff based on their police investigation is not undermined simply because Defendants did not give credence to Plaintiff's exculpatory statements.  "Probable cause does not necessarily disappear simply because an innocent explanation may be consistent with facts that an officer views as suspicious." Figueroa v. Mazza, 825 F.3d 89, 102 (2d Cir. 2016)

(internal quotation marks and citation omitted.)  "The probable cause inquiry is an objective inquiry, and when the police are confronted with conflicting witness accounts about what happened, courts do not second-guess a police officer's decision to credit one witness's account over another in the absence of facts to show why no objectively reasonable officer could have resolved the conflicting accounts as the police did." Mayo v. City of New Britain, 2021 U.S. Dist. LEXIS 32160, *15-16 (D. Conn. Feb. 22, 2021) (summary judgment granted in favor of nine New Britain police officers with respect to plaintiff's claims for false arrest and malicious prosecution despite providing exculpatory statements to police that disputed incriminating statements offered by other witnesses.)

It is thus conclusive that Rogozinski and Davis did have probable cause to arrest and initiate criminal proceedings against Plaintiff for violating Sec. 53a-167c and Sec. 53a-181, and therefore, Plaintiff's False Arrest and Malicious Prosecution claims fail as a matter of law.

3) Rogozinski and Davis had Arguable Probable Cause to Arrest and Commence Criminal Proceedings Against Plaintiff and thus Rogozinski and Davis are Entitled to Qualified Immunity.

"In the context of false arrest and malicious prosecution claims, an officer is entitled to qualified immunity if he had either probable cause or 'arguable probable cause.'" Dufort v. City of New York, 874 F.3d 338, 354 (2d Cir. 2017) (citation omitted.) "Arguable probable cause exists if officers of reasonable competence could disagree on whether the probable cause test was met." Id.  "[F]or the purpose of qualified immunity and probable cause, [the Court does] not deny officers the benefit of reasonable inferences [drawn] from the facts they possess at the time of a seizure." Figueroa v. Mazza, supra, 825 F.3d at 104 (internal quotation marks and citation omitted.)

There is no question that Rogozinski and Davis had at least arguable probable cause to arrest and initiate criminal proceedings against Plaintiff.  Rodriguez and Hourigan provided consistent and reliable statements to Rogozinski detailing Plaintiff's criminal conduct at the Hospital; and Rogozinski and Davis rationally concluded that Plaintiff's exculpatory statements were not credible. (Local 56(a)(1) Statement, *supra*, at ¶¶5-28).

Therefore, Plaintiff's False Arrest and Malicious Prosecution claims must fail on the basis of qualified immunity.

### e.  Plaintiff's Unreasonable Search and Seizure Claim Fails as a Matter of Law.

#### 1) Unreasonable Search and Seizure Claims - Generally:

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.  "As the text makes clear, the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" Riley v. California, 573 U.S. 373, 381 (2014) (citation omitted.) "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape… In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule… There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control' -- construing that phrase to mean the area from within

which he might gain possession of a weapon or destructible evidence. <u>Chimel v. California</u>, 395 U.S. 752, 762-763 (1969).

      "A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick ad hoc judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search. The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." <u>United States v. Robinson</u>, 414 U.S. 218, 235 (1973).

      2)  <u>Any Search and Seizure Conducted by Defendants was Incident to a Lawful Arrest and thus Reasonable Under the Circumstances.</u>

      As previously discussed, Rogozinski placed Plaintiff under arrest based on probable cause that Plaintiff violated <u>C.G.S. Sec. 53a-167c</u> "Assault on a Public Safety Officer" and <u>C.G.S. Sec. 53a-181</u> "Breach of Peace 2nd." (<u>Local 56(a)(1) Statement</u>, *supra*, at ¶¶23-29,36.)  According to Rogozinski, after placing Plaintiff under arrest, Rogozinski conducted a pat down of Plaintiff for his safety and seized any personal possessions belonging to Plaintiff including his wallet per City of New Britain Police

Department policy and procedure. (Id at ¶¶29-30.)  Despite Plaintiff's statement to the contrary in the Revised Complaint, Davis did not conduct a physical search of Plaintiff, nor did Davis take possession of Plaintiff's wallet. (Id at ¶¶35,43); (Doc. #33, *supra*, at ¶¶14,21.)  Also, despite Plaintiff's allegation in the Revised Complaint, neither Rogozinski nor Davis caused Plaintiff's jacket to be ripped or damaged; nor did Rogozinski or Davis witness any damage to Plaintiff's jacket. (Id at ¶46); (Doc. #33, *supra*, at ¶18.)  Additionally, per City of New Britain Police Department policy and procedure, Rogozinski brought Plaintiff to the booking facility at the City of New Britain Police Department Station (hereinafter the "Police Station") at which time he conducted a second physical search of Plaintiff for safety purposes. (Id at ¶37.)  Plaintiff was then released from police custody. (Id at ¶41.)  Plaintiff's personal belongings were all returned to Plaintiff upon his release from police custody. (Id at ¶42.)

Rogozinski's noninvasive pat downs of Plaintiff and temporary seizure of his personal belongings incident to his arrest were entirely routine, reasonable, and noneventful.  Thus, Plaintiff's unreasonable search and seizure claim is without merit.

   3) Rogozinski is Entitled to Qualified Immunity with Respect to
      Plaintiff's Unreasonable Search and Seizure Claim.

As discussed above, "[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." United States v. Robinson, *supra*, 414 U.S. at 235.  Therefore, it was objectively reasonable for Rogozinski to believe that his noninvasive pat downs of Plaintiff and temporary seizure of Plaintiff's personal effects were entirely lawful.  This is especially true in light of the fact that Rogozinski had probable cause that Plaintiff had just committed acts of

violence at the Hospital. Thus Plaintiff's unreasonable search and seizure claim against Rogozinski must be dismissed on the basis of qualified immunity.

### f.  Plaintiff's Equal Protection Claim Fails as a Matter of Law.

#### 1)  Equal Protection Claims - Generally:

"The Equal Protection Clause requires that the government treat all similarly situated people alike." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).  "Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, we have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." Id.  "To prevail on a claim of selective enforcement, plaintiffs in this Circuit traditionally have been required to show both (1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Id. (internal quotation marks and citations omitted.)

Although, "[a]s a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury… [t]his rule is not absolute, however, and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." Id at Fn. 2 (internal quotation marks and citations omitted.)

21

2) <u>Rogozinski and Davis did not Treat Plaintiff Differently than Other Similarly Situated Individuals on the Basis of Race.</u>

Plaintiff alleges in his Revised Complaint that he was arrested instead of the other individuals at the Hospital due to "racial complicity and animus." (<u>Doc. #33</u>, *supra*, at ¶31.)  However, the record clearly demonstrates that this allegation is false.  As previously discussed, Plaintiff was arrested because it was clear to Rogozinski and Davis that there was probable cause that Plaintiff violated <u>C.G.S. Sec. 53a-167c</u> and <u>C.G.S. Sec. 53a-181</u>.  It was clear to Rogozinski and Davis that Plaintiff had struck Rodriguez with a plow stick and that Plaintiff had grabbed Hourigan's uniform shirt in a hostile manner and caused physical injury to Hourigan without justification.  (<u>Local 56(a)(1) Statement</u>, *supra*, at ¶¶23-26.)  It was also clear to Rogozinski and Davis that any action taken by Hourigan or other individuals at the Hospital to physically restrain or subdue Plaintiff in response to Plaintiff's violent behavior was entirely reasonable and justified, and that Plaintiff was not physically injured by any individual at the Hospital. (<u>Id</u> at ¶26-27,44.)  It also clear to Rogozinski and Davis that no person at the Hospital committed any criminal act against Plaintiff. (<u>Id</u>.)  Plaintiff was the only individual subject to police action at the Hospital because Plaintiff was the only person discovered by Defendants to have committed criminal acts and presented a danger to the public.

Further, according to both Rogozinski and Davis, they did not arrest Plaintiff because of Plaintiff's race or religious beliefs, nor did Rogozinski or Davis take any action against Plaintiff based on Plaintiff's race or religious beliefs. (<u>Id</u> at ¶47.) Rogozinski and Davis state that they did not arrest Plaintiff in order to inhibit or punish the exercise of Plaintiff's state or federal constitutional rights, nor did Rogozinski or Davis take any action against Plaintiff designed to inhibit or punish the exercise of

22

Plaintiff's state or federal constitutional rights. (Id.)  Rogozinski and Davis also state that they did not arrest Plaintiff in order to injure Plaintiff, nor did Rogozinski or Davis take any action against Plaintiff designed to injure Plaintiff. (Id.)  Rogozinski and Davis also state that they did not inflict any scratches or bruises on Plaintiff or physically attack or physically mistreat Plaintiff. (Id at ¶45.)

Further, Rogozinski and Davis state that at no time did they speak to Plaintiff, or present themselves to Plaintiff, in an intimidating or disrespectful manner, nor did they at any time make intimidating, offensive, inappropriate, or insensitive comments, including comments based on race, to Plaintiff or in the presence of Plaintiff. (Id at ¶¶48-49.)  In fact, Rogozinski and Davis state that during their encounter with Plaintiff on April 19, 2019, Rogozinski and Davis were entirely polite and professional towards Plaintiff and only treated Plaintiff with respect and dignity. (Id at ¶50.)

Thus, Plaintiff's equal protection claim is without merit.

3) <u>Rogozinski and Davis are Entitled to Qualified Immunity with Respect to Plaintiff's Equal Protection Claim.</u>

Because both Rogozinski and Davis acted with probable cause in arresting Plaintiff; because it was clear that no other individual committed criminal acts at the Hospital; and because both Rogozinski and Davis confirm that they in no way acted with improper motivation in arresting Plaintiff, it is clear that it was objectively reasonable for both men to believe that their acts in connection with the arrest of Plaintiff were entirely lawful, and thus Rogozinski and Davis are entitled to qualified immunity with respect to Plaintiff's equal protection claim.

### g.  Plaintiff's Excessive Use of Force Claim Fails as a Matter of Law.

#### 1)  Excessive Use of Force Claims - Generally:

"…[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard…" Graham v. Connor, 490 U.S. 386, 395 (1989).  "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id.  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id at 396 (quoting United States v. Place, 462 U.S. 696, 703 (1983).

"Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including [A] the severity of the crime at issue, [B] whether the suspect poses an immediate threat to the safety of the officers or others, and [C] whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (internal quotation marks and citations omitted.)  "With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' violates the Fourth Amendment.'" Id at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (1973).  "The

calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id at 397 (citations omitted.)  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id at 396.

"As in other Fourth Amendment contexts… the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id at 397.  "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id.  Similarly, "…like the Fourth Amendment of the United States Constitution [Section Seven of the Connecticut Constitution] protects against unreasonable use of force...." Carey v. Maloney, 480 F. Supp. 2d 548, 561 (D. Conn. 2007).

> 2) Rogozinski and Davis had no Personal Involvement in the Alleged
> Acts of Unreasonable Force Against Plaintiff.

As discussed above, in order for Plaintiff to maintain a claim pursuant to Sec. 1983 against Defendants, Plaintiff must establish that Defendants had personal involvement in the alleged illegal act.  In this case, Plaintiff's excessive use of force claim is not directed at Rogozinski or Davis, but is instead directed at Hourigan, Rodriguez and an unnamed male. (Doc. #33, *supra*, at ¶¶11,34.)  In fact, Plaintiff states in his Revised Complaint that Rogozinski and Davis were not even present at the

Hospital until after Plaintiff was attacked by Hourigan, Rodriguez and the unnamed male. (Id at ¶13.)  According to Rogozinski and Davis Plaintiff was peacefully sitting on a bench when they arrived at the Hospital. (Id at ¶¶2-3.)  Further, at no time did Rogozinski or Davis physically attack or physically mistreat Plaintiff. (Id at ¶45.)

Therefore, Plaintiff cannot maintain his Excessive Use of Force claim against Rogozinski and Davis.

> 3)  Rogozinski's Use of Force in Handcuffing Plaintiff was Objectively Reasonable Under the Circumstance and thus Rogozinski is Entitled to Qualified Immunity.

The only allegation in the Revised Complaint that Defendants used any meaningful physical force against Plaintiff is that Davis handcuffed Plaintiff upon his arrest. (Doc. #33, *supra*, at ¶¶14-15.)  Although Plaintiff was handcuffed by one of the Defendants, it was Rogozinski who handcuffed Plaintiff and not Davis. (Local 56(a)(1) Statement, *supra*, at ¶¶31-32.)  The record however clearly demonstrates that Rogozinski did not use excessive force in handcuffing Plaintiff.  "Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out." Esmont v. City of New York, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005) (citation omitted.)  "[I]n evaluating the reasonableness of handcuffing, a [c]ourt is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." Id at 215 (citation omitted); *See* Cugini v. City of New York, 941 F.3d 604, 612 (2d Cir. 2019.)

According to Rogozinski, in the course of placing handcuffs on Plaintiff, Rogozinski made sure the handcuffs were double locked and checked for proper fit so

that they would be secure and comfortable on Plaintiff's wrists. (Local 56(a)(1)

Statement, *supra*, at ¶31.)  Rogozinski further states that at no time did Plaintiff

verbalize or physically exhibit to Rogozinski or Davis any sign that these handcuffs were

tight or uncomfortable, nor did these handcuffs cause any physical injury to Plaintiff.

(Id.)

     There is no question that Rogozinski's use of force in handcuffing Plaintiff while

taking Plaintiff into custody was objectively reasonable and therefore Rogozinski is

entitled to qualified immunity.

### h.  Plaintiff's Due Process Claim Fails as a Matter of Law.

#### 1)  Due Process Claims - Generally:

"The Fourteenth Amendment reads in part: '[no] State [shall] deprive any person

of life, liberty, or property, without due process of law,' and protects 'the individual

against arbitrary action of government.'" Kentucky Dep't of Corrections v. Thompson,

490 U.S. 454, 459-460 (1989) (citation omitted.)  "We examine procedural due process

questions in two steps: the first asks whether there exists a liberty or property interest

which has been interfered with by the State, the second examines whether the

procedures attendant upon that deprivation were constitutionally sufficient." Id at 460.

#### 2)  Plaintiff's Due Process Claim Must Fail as Plaintiff's Liberty or Property Interests were not Subject to an Unconstitutional Deprivation.

Plaintiff contends that Defendants denied Plaintiff his right to "procedural due

process" throughout his encounter with Defendants.  However, the record clearly shows

that Plaintiff was not subject to any unconstitutional act by Defendants.  Plaintiff was

lawfully arrested on the basis of probable cause. (Local 56(a)(1) Statement, *supra*, at

¶¶1-29).  Plaintiff was lawfully searched and his possessions lawfully seized incident to his arrest. (Id at ¶¶30,34,37,42).  Plaintiff was also not harmed or mistreated by Defendants or any person at the Hospital. (Id at ¶¶44-50).

Additionally, Plaintiff's claim that Defendants' police reports were falsified is not accurate.  Despite Plaintiff's allegations, safety officers were present at the Hospital; Plaintiff was not mistreated by these safety officers; and Rogozinski did discover that the events involving Plaintiff were captured in whole or in part on Hospital surveillance cameras. (Id at ¶¶4,27,51).

Although Plaintiff repeatedly raises the point in his Revised Complaint that he was wearing a catheter on April 19, 2019, Rogozinski and Davis did not realize Plaintiff was wearing a catheter because the catheter was completely hidden under Plaintiff's pants and Rogozinski's physical searches of Plaintiff were designed to avoid Plaintiff's crotch area. (Id at ¶40).  Further, Plaintiff did not inform Defendants that he was wearing a catheter until they were in the booking room at the Station. (Id.)  Upon learning that Plaintiff was wearing a catheter, Rogozinski took immediate action to notify his superior officer and sought Plaintiff's immediate release from custody. (Id at ¶41).  Therefore, Plaintiff's claims regarding his catheter are simply irrelevant.

Therefore, as Plaintiff was not subjected to an unconstitutional deprivation of his liberty or property by Defendants, Plaintiff's due process claim must fail.

3)  Rogozinski and Davis are Entitled to Qualified Immunity with Respect to Plaintiff's Due Process Claim.

At no time did Rogozinski or Davis cause Plaintiff to suffer an unconstitutional deprivation of any kind.  Rogozinski and Davis arrested Plaintiff on the basis of probable cause; Plaintiff was lawfully searched and his possessions lawfully and temporarily

seized incident to that arrest; and neither Rogozinski nor Davis took any action to harm or mistreat Plaintiff in any way. (Id at ¶¶1-50).  Therefore, it was objectively reasonable for Rogozinski and Davis to believe that their actions with respect to Plaintiff were entirely lawful and thus Plaintiff's due process claim against Rogozinski and Davis must be dismissed on the basis of qualified immunity.

### i.   Plaintiff's Free Exercise of Religion Claim Fails as a Matter of Law.

#### 1)   Free Exercise of Religion Claims - Generally:

"The Free Exercise Clause protects both an individual's private right to religious belief and the performance of (or abstention from) physical acts that constitute the free exercise of religion…" Agudath Isr. v. Cuomo, 983 F.3d 620, 631 (2d Cir. 2020) (citation and internal quotation marks omitted.)  However, "[t]his protection does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability… and such a neutral and generally applicable policy is subject to only rational-basis review." Id. (citation and internal quotation marks omitted.)  "To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself." Employment Div. v. Smith, 494 U.S. 872, 879 (1990) (citation omitted.)  "Official action burdening religious conduct that is not both neutral and generally applicable, however, is subject to strict scrutiny." Agudath Isr. v. Cuomo, supra, 983 F.3d at 631 (citation and internal quotation marks omitted.)

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." Fulton v. City of Phila., 2021 U.S. LEXIS 3121 *15 (citation omitted.)  "A law is not generally applicable if

it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." <u>Id.</u> (citation and internal quotation marks omitted.)

       2) <u>Plaintiff did not Object to Being Photographed During the Booking Process Based on his Religious Beliefs; and all Prisoners are Required to be Photographed for Identification Purposes.</u>

Plaintiff states in his Revised Complaint that he was photographed at the police station. (<u>Doc. #33</u>, *supra*, at ¶¶20,42.)  According to Plaintiff, this violated his "religious principles" because he was "without his cap." (<u>Id</u>.)  However, Plaintiff "did not feel free to protest being photographed" due to "intimidation and racial animus shown by the defendants." (<u>Id</u>.)

According to Davis, Davis did photograph Plaintiff at the booking facility at the Police Station for identification purposes. (<u>Local 56(a)(1) Statement</u>, *supra*, at ¶38.) According to City of New Britain Police Department policy and procedure, all prisoners who are brought into the booking facility at the Police Station are to be photographed for identification purposes. (<u>Id</u>.)  According to Rogozinski and Davis, at no time did Plaintiff object in the presence of either Rogozinski or Davis to being photographed on the basis of Plaintiff's religious beliefs, nor did Plaintiff object for any reason to being photographed. (<u>Id</u> at ¶39.)

Despite Plaintiff's accusation, Rogozinski and Davis confirm that neither man spoke to Plaintiff, or presented themselves to Plaintiff, in an intimidating or disrespectful manner, nor did they make intimidating, offensive, inappropriate, or insensitive comments, including comments based on race, to Plaintiff or in the presence of Plaintiff. (<u>Id</u>. at ¶48-49.)  In fact, Rogozinski and Davis were entirely polite and professional

towards Plaintiff and only treated Plaintiff with respect and dignity throughout the events of April 19, 2019. (Id at ¶50.)

Therefore, Plaintiff's free exercise claim is without merit.

### 3) Rogozinski and Davis are Entitled to Qualified Immunity with Respect to Plaintiff's Religious Free Exercise Claim.

At no time were Rogozinski or Davis aware that it was not in keeping with Plaintiff's religious beliefs for Plaintiff to be photographed without his headwear.  As previously discussed, at no time did Plaintiff object to Rogozinski or Davis to being photographed on the basis of his religious beliefs. (Id at ¶39.)  In fact, Plaintiff did not object in any way to being photographed. (Id.)  Further, Plaintiff's claim that he was unwilling to object to being photographed due to "intimidation and racial animus shown by the defendants" is simply not true.  Rogozinski and Davis did not act towards Plaintiff in an intimidating or disrespectful manner based on race or otherwise, but treated Plaintiff with respect and dignity throughout the events of April 19, 2019. (Id at ¶¶48-50.) Therefore, it was objectively reasonable for Rogozinski and Davis to believe that their actions on April 19, 2019 did not violate Plaintiff's religious practices and thus Plaintiff's free exercise claim against Rogozinski and Davis must be dismissed on the basis of qualified immunity.

### j.  Plaintiff's Claims for Assault, Intentional Infliction of Emotional Distress, Negligence and "Conspiracy to Obstruct State Court Justice" Fail as a Matter of Law.

#### 1) Assault

##### A.  Assault Claims - Generally:

"In Connecticut, there are two elements of the tort of civil assault: (1) the defendant must have 'intend[ed] to cause a harmful or offensive contact… or an

imminent apprehension of such contact,' with another person, and (2) the other person was actually 'put in imminent apprehension' as a result of the contact." <u>Velez v. Harris</u>, 2018 U.S. Dist. LEXIS 137644 *15 (D. Conn. Aug. 15, 2018) (quoting <u>Simms v. Chaisson</u>, 277 Conn. 319, 331 (2006).  "[E]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of [excessive force and state law assault and battery claims are] substantially identical." <u>Humphrey v. Landers</u>, 344 Fed. Appx. 686, 688 (2d Cir. 2009) (quoting <u>Posr v. Doherty</u>, 944 F.2d 91, 94-95 (2d Cir. 1991).

B.  Plaintiff was not Placed in Apprehension of Imminent Harm by Defendants.

As previously discussed, at no time on April 19, 2019 did Rogozinski or Davis physically attack or physically mistreat Plaintiff in any way. (<u>Local 56(a)(1) Statement</u>, *supra*, at ¶45.)  Nor did Rogozinski or Davis speak to Plaintiff or present themselves to Plaintiff in an intimidating or disrespectful manner; and Rogozinski and Davis were entirely polite and professional and only treated Plaintiff with respect and dignity. (<u>Id</u> at ¶¶ 48-50.)  Therefore, at no time did Defendants place Plaintiff in imminent apprehension of harm and thus Plaintiff's Assault claim must fail.

2)  <u>Intentional Infliction of Emotional Distress</u>

A.  Intentional Infliction of Emotional Distress Claims - Generally.

"In order for the plaintiff to prevail in a case for liability under… [intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct

was extreme and outrageous; (3) that the defendant's conduct was the cause of the

plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was

severe." <u>Appleton v. Board of Educ.</u>, 254 Conn. 205, 210 (2000) (citations omitted.)

"Liability for intentional infliction of emotional distress requires conduct that exceeds 'all

bounds usually tolerated by decent society…' Liability has been found only where the

conduct has been so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized community. Generally, the case is one in which the recitation of

the facts to an average member of the community would arouse his resentment against

the actor, and lead him to exclaim, 'Outrageous!'… Conduct on the part of the defendant

that is merely insulting or displays bad manners or results in hurt feelings is insufficient

to form the basis for an action based upon intentional infliction of emotional distress." <u>Id</u>.

at 210-211 (citations omitted.)

"Whether a defendant's conduct is sufficient to satisfy the requirement that it be

extreme and outrageous is initially a question for the court to determine… Only where

reasonable minds disagree does it become an issue for the jury. <u>Id.</u> at 210 (citations

omitted.

> B.  Rogozinski and Davis did not Engage in Extreme and
>     Outrageous Behavior.

As discussed above, at no time on April 19, 2019 did Rogozinski or Davis

physically attack or physically mistreat Plaintiff; nor did Rogozinski or Davis speak to

Plaintiff or present themselves to Plaintiff in a disrespectful, intimidating, offensive or

inappropriate manner; and, in fact, Rogozinski and Davis were entirely polite and

professional towards Plaintiff and only treated Plaintiff with respect and dignity. (<u>Local</u>

56(a)(1) Statement, *supra*, at ¶¶45,48-50.)  Further, Rogozinski and Davis attest that upon learning that Plaintiff was wearing a catheter, Rogozinski took immediate action by notifying his superior officer that Plaintiff was wearing a catheter and then immediately released Plaintiff from custody. (Id. at ¶¶40-41).

Therefore, Plaintiff's Intentional Infliction of Emotional Distress claim is unsustainable.

   3)  Negligence

      A.  Defendants are Entitled to Governmental Immunity Pursuant to C.G.S. Sec. 52-557n.

         i.  Governmental Immunity Pursuant to C.G.S. Sec. 52-557n - Generally:

"The [common-law] doctrines that determine the tort liability of municipal employees are well established… Generally, a municipal employee is liable for the misperformance of ministerial acts, but has a qualified immunity in the performance of governmental acts… Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature…" Borelli (Estate of Giordano) v. Renaldi, 336 Conn. 1, 11 (2020).  "The tort liability of a municipality has been codified in § 52-557n. Section 52-557n(a)(1) provides that [e]xcept as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties… Section 52-557n(a)(2)(B) extends, however, the same discretionary act immunity that applies to municipal officials to the municipalities themselves by providing that they will not be liable for damages caused by negligent acts or omissions which

require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." Id. (citing Violano v. Fernandez, 280 Conn. 310, 318-320, (2006).

The issue of whether a governmental act is discretionary or subject to a ministerial duty is a matter of law to be decided exclusively by the Court. Ventura v. Town of East Haven, 330 Conn. 613, 636 (2019).  "As… discussed previously [the Connecticut Supreme Court]… on numerous occasions, has stated unequivocally that the determination of whether a governmental or ministerial duty exists gives rise to a question of law for resolution by the court." Id at 634.  "…[W]hether a statute, regulation or other provision of law creates a ministerial duty ordinarily presents a question of law to be decided by the court [and]… [i]nsofar as our language in… several… cases indicates otherwise, we expressly disavow that language." Id. at 636-637.  "For purposes of determining whether a duty is discretionary or ministerial, [the Connecticut Supreme Court] has recognized that "[t]here is a difference between laws that impose general duties on officials and those that mandate a particular response to specific conditions.  A ministerial act is one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment [or discretion] upon the propriety of the act being done… In contrast, when an official has a general duty to perform a certain act, but there is no 'city charter provision, ordinance, regulation, rule, policy, or any other directive [requiring the government official to act in a] prescribed manner,' the duty is deemed discretionary." Northrup v. Witkowski, 332 Conn. 158, 169-170 (2019) (citations omitted.)

ii. Defendants are Entitled to Governmental Immunity Pursuant to C.G.S. Sec. 52-557n as Defendants were Engaged in Routine Police Conduct that is Inherently Subject to Judgment and Discretion.

''It is firmly established that the operation of a police department is a governmental function, and that acts or omissions in connection therewith ordinarily do not give rise to liability on the part of the municipality.  Indeed, [the Connecticut Supreme Court] has long recognized that it is not in the public's interest to allow a jury of laymen with the benefit of 20/20 hindsight to second- guess the exercise of a policeman's discretionary professional duty.  Such discretion is no discretion at all. Thus, as a general rule, police officers are protected by discretionary act immunity when they perform the typical functions of a police officer.'' Ventura v. Town of East Haven, *supra*, 330 Conn. at 630-631 (citations and internal quotation marks omitted); *See e.g.* Walker v. Folch, 2019 Conn. Super. LEXIS 805 (Police officer's decision whether to pursue a fleeing suspect is a matter of judgment and discretion entitled to immunity); Dodge v. Verillo, 2018 Conn. Super. LEXIS 1448 (The degree of lawful force justified in a given situation requires a police officer's judgment in evaluating the situation entitled to immunity); Gonzalez v. Bridgeport, 1993 Conn. Super. LEXIS 1400 (Investigation of crime and initiation of arrest warrants for suspects are police functions that require judgment and discretion entitled to immunity.)

"The policy behind discretionary act immunity for police officers is based on the desire to encourage police officers to use their discretion in the performance of their typical duties. Discretionary act immunity reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions,

36

unhampered by fear of second guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury." <u>Smart v. Corbitt</u>, 126 Conn. App. 788, 800 (2011) (citation omitted.)

The acts of Rogozinski and Davis during the events of April 19, 2019 are unquestionably subject to judgment and discretion.  It was entirely within the judgment and discretion of Rogozinski and Davis to pursue their police investigation at the Hospital in a manner that the circumstances demanded, including how to conduct interviews of Plaintiff and any other witnesses.  The officers rightfully concluded upon completion of their investigation that Plaintiff had committed a crime, and then lawfully and professionally pursued the arrest and prosecution of Plaintiff. (<u>Local 56(a)(1) Statement</u>, *supra*, at ¶¶1-50.)

Therefore, as these acts are inherently, and unequivocally, subject to judgment and discretion, Rogozinski and Davis are immune from liability with respect to Plaintiff's Negligence claim.

iii.   <u>The Exceptions to Governmental Immunity Pursuant to C.G.S. Sec. 52-557n Do Not Apply</u>.

There are "three exceptions or circumstances [pursuant to subsection (a)] under which liability may attach even though the act was discretionary: first, where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm;… second, where a statute specifically provides a cause of action against a municipality or a municipal officer for failure to enforce certain laws;… and third, where the alleged acts involve malice, wantonness or intent to injure rather than negligence." <u>Evon v. Andrews</u>, 211 Conn. 501, 505 (1989).  The second and the third exceptions do not apply since Plaintiff's

Negligence claim does not specify a statute which provides a cause of action, nor does Plaintiff's Negligence claim allege that Defendants acted with malice, wantonness or with intent to injure the Plaintiff.

The first exception also does not apply because the record demonstrates that it was not apparent to Defendants that Plaintiff was subject to imminent harm.  "This identifiable person-imminent harm exception has three requirements: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm... All three must be proven in order for the exception to apply..." Martinez v. New Haven, 328 Conn. 1, 8 (2018).

"...[T]he proper standard for determining whether a harm was imminent is whether it was apparent to the municipal defendant that the dangerous condition was so likely to cause harm that the defendant had a clear and unequivocal duty to act immediately to prevent the harm. Haynes v. City of Middletown, 314 Conn. at 322-323 (2014).  "In Haynes... our Supreme Court... emphasized that in determining whether a harm is 'imminent,' it should focus on 'the magnitude of the risk that the condition created..." Northrup v Witkowski, 175 Conn.App. 223, 244, cert. granted on other grounds, 332 Conn. 158, (2017)  "...[I]f a harm is not so likely to happen that it gives rise to a clear duty to correct the dangerous condition creating the risk of harm immediately upon discovering it, the harm is not imminent." Haynes v. City of Middletown, supra, 314 Conn at 317-318.

With respect to the apparentness requirement, "...the plaintiff must show that the circumstances would have made the government agent aware that his or her acts or omissions would likely have subjected the victim to imminent harm ... This is an

objective test pursuant to which we consider the information available to the government agent at the time of her discretionary act or omission… We do not consider what the government agent could have discovered after engaging in additional inquiry… Imposing such a requirement on government officials would run counter to the policy goal underlying all discretionary act immunity, that is, keeping public officials unafraid to exercise judgment." Edgerton v. Clinton, 311 Conn. 217, 231 (2014) (citations omitted; footnote omitted; internal quotation marks omitted.)

"...[O]ur [Supreme Court [has] concluded that the [Haynes] test presents a question of law" to be decided by the Court. Williams v. Housing Authority, 159 Conn.App. 679, 707 (2015).  Therefore, the Court is empowered to grant summary judgment in favor of a defendant if the record demonstrates that no ministerial duty was violated and no imminent harm existed or no imminent harm was apparent to defendant.

As discussed above, at no time on April 19, 2019 did Rogozinski or Davis physically attack or physically mistreat Plaintiff, speak to Plaintiff, or present themselves to Plaintiff, in a disrespectful, intimidating, offensive or inappropriate manner; and Rogozinski and Davis were entirely polite and professional towards Plaintiff and only treated Plaintiff with respect and dignity. (Local 56(a)(1) Statement, supra, at ¶¶45,48-50.)  Further, despite Plaintiff's allegations to the contrary, no person present at the Hospital was sitting on top of Plaintiff, lying on top of Plaintiff, or in any way placed on top of Plaintiff. (Id at ¶3); (Doc. #33, supra, at ¶13.)  Also, Rogozinski and Davis did not observe any scrapes, bruises or other injuries on Plaintiff, nor did Plaintiff complain of any scrapes, bruises or other injuries. (Id at ¶44.)

It is clear that Plaintiff was not placed in imminent harm during Plaintiff's interactions with Defendants and Hospital staff, nor was it ever apparent to Defendants that Plaintiff was subject to imminent harm.  Thus Plaintiff cannot breach the shield of governmental immunity in this case and Plaintiff's Negligence claim must fail.

> 4) <u>Plaintiff's "Conspiracy to Obstruct State Court Justice" Count Fails to State a Claim Upon Which Relief can be Granted.</u>

Plaintiff asserts a claim in his Revised Complaint for "Conspiracy to Obstruct State Court Justice."  There is no such claim recognized under state or federal law.  It appears Plaintiff simply invented this claim himself.  Therefore, this claim must be dismissed.

## IV.  <u>CONCLUSION</u>

For all of the foregoing reasons, summary judgment should enter in favor of the Defendants, and an order should enter dismissing the Complaint.

DEFENDANTS,
BLAIN J. ROGOZINSKI and JONATHAN DAVIS

By: */s/ John F. Diakun*
John F. Diakun, Esq. (ct30453)
City of New Britain
Office of Corporation Counsel
27 West Main Street, Room 408
New Britain, CT 06051
Tel: 860-826-3428
E-Mail: John.Diakun@newbritainct.gov

## CERTIFICATE OF SERVICE

I certify that a copy of the above was or will immediately be delivered on **July 8, 2021** to all counsel and self-represented parties of record via first class mail, postage prepaid, and e-mail as follows:

MELVIN C. WASHINGTON
50 BASSETT STREET
APT A313
NEW BRITAIN, CT 06051
mcwash88@gmail.com

/s/ John F. Diakun
John F. Diakun (ct30453)